

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| PETER MANUEL CANDELARIA, | § | No. 08-20-00010-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 118th District Court |
| THE STATE OF TEXAS, | § | |
| | | of Howard County, Texas |
| Appellee. | § | |
| | | (TC#15,559) |
| | § | |

## **O P I N I O N**

Appellant, Peter Manuel Candelaria, appeals his conviction of aggravated assault on a public servant, to-wit: Chris Mahurin. TEX.PENAL CODE ANN. § 22.01(b).[1] In a single issue, Appellant challenges his conviction, asserting the evidence is legally insufficient. We affirm.

## BACKGROUND
### *Factual Background*

---

[1] Appellant was charged with seven offenses arising out of a single criminal action. At trial, the State filed a motion to join all seven offenses, which was granted. Appellant challenges his conviction in seven separate appeals—08-20-00007-CR, 08-20-00008-CR, 08-20-00009-CR, 08-20-00010-CR, 08-20-00011-CR, 08-20-00012-CR, and 08-20-00013-CR. Carrying forward Appellant's individual structure, we address each appeal separately. This particular appeal solely addresses appellate cause number 08-20-00010-CR, which involves the offense of aggravated assault on a public servant, to-wit; Chris Mahurin. Additionally, this case was transferred from Eastland Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX.GOV'T CODE ANN. § 73.001. We follow the precedent of the Eastland Court of Appeals to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

The Big Spring Police Department had actively been attempting to locate and arrest Appellant for outstanding warrants. On the morning of December 28, 2018, Sergeant Steve Henry and Investigator Dustin Thomas conducted surveillance at a known residence of Appellant. Sergeant Henry and Investigator Thomas sat and surveilled from their respective unit vehicles— unmarked trucks equipped with red and blue lights, sirens, and radio. Based on information the officers had, they believed Appellant drove a burgundy or red Buick, and knew the license plate number. After not detecting activity, the officers took their lunch break and left the location. After lunch, Investigator Thomas returned to the location and notified Sergeant Henry that he detected movement; Appellant was "getting in and out of the house and to the vehicle." Sergeant Henry was in communication with Investigator Thomas while en route to the surveilled address when he detected the burgundy Buick and positively identified the driver as Appellant. Sergeant Henry then pulled up behind Appellant, activated the emergency lights of his undercover unit and notified dispatch of the pursuit. Appellant continued to accelerate, ran at least two stop signs, and at one point, drove in the wrong direction on a one-way street. The vehicle then stopped, and two individuals exited the vehicle—Appellant and a female. Appellant ran away and a foot pursuit ensued.

Several law enforcement officers responded to the scene upon learning of the pursuit via radio-dispatch and a search for Appellant followed. Investigator Thomas searched an alleyway and ultimately found Appellant hiding inside of a dumpster holding a firearm to his head. After confirming Appellant was armed and alerting the others, the officers all took cover. The situation morphed into what the officers described as a "standoff" that lasted over two hours. The officers involved in the standoff include: Chris Dominguez, Steve Henry, Chris Mahurin, Dustin Thomas,

Marc Thomas, and Rory Gammons—who are all alleged, individual victims of Appellant's respective convictions for aggravated assault on a public servant. At the time Appellant opened fire, the approximate locations of the officers were as follows: Investigator Dustin Thomas, Detective Dominguez, and Investigator Marc Thomas all standing side by side in very close proximity to one another. Lieutenant Mahurin was located a few feet north of and parallel to the aforementioned officers. Investigator Gammons was located just behind and west of Detective Dominguez.

After Appellant opened fire in the direction of the officers, Sergeant Marcus Thomas returned fire and shot three rounds, one of which struck Appellant's hand. Investigator Angelica Wilkins, a certified law enforcement negotiator, eventually convinced Appellant to surrender and exit the dumpster. A 9-millimeter pistol was retrieved from Appellant, and three empty shell casings from that pistol were later found. Appellant was arrested and taken to a hospital where he received medical treatment for his injury.

It is uncontested that during the standoff, Appellant refused to obey commands, and threatened his own life and the officers' lives; Appellant made clear he was either going to shoot himself once he was found, or the officers would have to kill him because he was not going back to prison—a tactic commonly known as "suicide by cop." The testimony, however, from each respective officer, varies in regard to the number of shots heard or seen fired from Appellant's pistol.

***Procedural Background***

Appellant was charged with aggravated assault on a public servant, to-wit: Chris Mahurin. The jury found Appellant guilty and sentenced him to the Institutional Division of the Texas Department of Criminal Justice for a term of forty years. This appeal followed.

## DISCUSSION

In a single issue, Appellant seeks reversal of his conviction, asserting the evidence is legally insufficient. We disagree.

### *Standard of Review and Applicable Law*

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In *Brooks*, the Texas Court of Criminal Appeals held the only standard a reviewing court should apply when examining the sufficiency of the evidence is the legal sufficiency standard articulated in *Jackson*, which requires affording deference to the jury's credibility and weight determinations. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010).[2] The critical inquiry in a legal sufficiency challenge is whether the evidence in the record could reasonably support a conviction of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007).

When reviewing the legal sufficiency of the evidence, we must view all of the evidence in the light most favorable to the verdict to determine whether any rational juror could have found the defendant guilty of the essential elements of the offense beyond a reasonable doubt. *Salinas v.*

---

[2] Appellant incorrectly asserts a *factual* insufficiency claim; the court in *Brooks* abandoned the factual sufficiency standard, codifying it to a standard of legal sufficiency. 323 S.W.3d at 915 (Cochran, J., concurring op.)("To declare the evidence factually insufficient necessarily turns an appellate judge, viewing only the cold written record, into a self-appointed thirteenth juror with absolute veto power over the twelve citizens who actually saw the witnesses, heard the evidence, and reached a rational, reasonable verdict.").

*State*, 163 S.W.3d 734, 737 (Tex.Crim.App. 2005). A lack of direct evidence is not dispositive on the issue of the defendant's guilt; guilt may be established by circumstantial evidence alone. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004). We measure the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Thomas v. State*, 303 S.W.3d 331, 333 (Tex.App.—El Paso 2009, no pet.)(*citing Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997)). A hypothetically correct charge accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240.

We bear in mind that the trier of fact is the sole judge of the weight and credibility of the evidence, and we must presume the fact finder resolved any conflicting inferences in favor of the verdict and we defer to that resolution. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014) (*citing Jackson*, 443 U.S. at 319). A reviewing court may not reevaluate the weight and credibility of the evidence or substitute its judgment for that of the fact finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010). Our only task under this standard is to determine whether, based on the evidence and reasonable inferences drawn therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

A person commits assault if the person intentionally or knowingly threatens another with imminent bodily injury. TEX.PENAL CODE ANN. § 22.01(a)(2). A person commits aggravated assault on a public servant if assault is committed as defined in Section 22.01, and the person uses or exhibits a deadly weapon during the commission of the assault against a person whom the actor knows is a public servant while the public servant is lawfully discharging an official duty. TEX.PENAL CODE ANN. § 22.02(a)(2), 22.02(b)(2)(B).

5

As applicable to the offense of aggravated assault on a public servant in this case, a hypothetically correct jury charge would ask whether Appellant: (1) intentionally or knowingly; (2) threatened another with imminent bodily injury by use of a deadly weapon; (3) against a person whom he knew was a public servant while the public servant was lawfully discharging an official duty. *Id.*

*Analysis*

In the instant case, Lieutenant Mahurin of the Big Spring Police Department learned of the vehicle pursuit involving Appellant via radio. When the chase became a foot pursuit, Lieutenant Mahurin dispatched to the scene to assist in locating Appellant. Upon arrival, Lieutenant Mahurin saw the officers in an alleyway and heard Sergeant Henry saying, "Come out, Pete" as the search for Appellant continued. Soon after, Lieutenant Mahurin heard a fellow officer yell out, "He's over here[!]" As Lieutenant Mahurin approached the dumpster where Appellant was found, Sergeant Henry yelled that Appellant was armed. Lieutenant Mahurin then heard a gunshot and immediately took cover. Sergeant Henry asked Lieutenant Mahurin for his pepper spray, and Sergeant Henry thereafter deployed pepper spray into the dumpster. Lieutenant Mahurin then immediately heard a second shot fire from the dumpster, followed by a third shot. During the ordeal, Lieutenant Mahurin recalled hearing Appellant yelling, "Leave me alone" and "I'm not going back to jail." When asked to describe what he saw and heard in the alleyway as he made contact with Appellant, Lieutenant Mahurin explained:

> A. I'm about parallel with [Investigator Dustin Thomas, Dominguez, and Marc Thomas] when I see [Appellant's] arm and the gun coming out of the trashcan and it pans north and south. I see what I believe to be a recoil at the time I hear Sergeant Thomas fire his weapon three times and then I hear [Appellant] screaming and I --

.        .        .

6

Q. So you saw a visual -- you observed visually something that appeared to you to indicate what?

A. Yes. It appeared to me that a shot had been fired from the gun.

Q. And in terms of direction, where was that gun pointed when it went off?

A. Down the alley in the direction of the officers that were standing here in the alley.

Q. What about you? How was it in relationship to you?

A. Yeah, same direction. Pointed in the alley in the direction of us.

Q. So there's sort of a shot that takes place from the Dumpster that goes westward down the alley?

A. West down the alleyway, yes.

Q. And you visually observed that?

A. Yes.

.            .            .

Q. Did you hear the gun go off from the Dumpster?

A. I didn't hear a sound from the Dumpster, no. I heard the rifle fire.

Q. But you visually observed something that is consistent with a gun going off?

A. Yes. That I believe it was firing, yes.

Q. Was it fired in the general direction of you?

A. Yes.

Q. What happened -- and how did that affect you, to see this gun pointed that direction and the gun go off?

A. Well, obviously, I'm in fear for my safety and the other officers' safety prior to this. I mean, from the first shot ringing out. I don't know exactly where Sergeant

7

Henry is at the time, but he was in close proximity to the trashcan from when the first shot was fired. So, I mean, obviously I'm in fear from that point.

Q. You were -- You were in the uniform you're wearing today or --

A. Yes, sir. . . .

Q. So you were identified as a Big Spring police officer?

A. Yes.

Q. Did you hear -- did you ever hear [Appellant] make references to the police or things of that nature?

A. He had made comments about he's not going back to jail and we would have to shoot him.

Q. Did you hear him – did you ever hear him threaten that he was going to shoot police officers?

A. Yeah. During – he advised at one point he would stand up and start shooting.

Lieutenant Mahurin further discussed the standoff, describing how he began to feel threatened the moment Appellant fired the first shot. Appellant himself also testified and admitted to firing his pistol at least three times. The following exchange between Appellant and the prosecutor occurred:

Q. Were you attempting to frighten the officers away?

A. Yes. I wanted them to get away from me.

Q. So your intent was to threaten them by firing that weapon?

A. To scare them, yes.

Appellant argues the testimony is to confusing, conflicting, and unreliable to support his conviction. The State counters by asserting testimonial conflicts present issues of fact and

credibility for the jury to decide. We agree. The trier of fact is the sole judge of the weight and credibility of the evidence and we must we defer to that resolution. *Dobbs*, 434 S.W.3d at 170.

Based on the evidence, the following testimony and the reasonable inferences drawn therefrom, we deduce a rational jury could have concluded Appellant: (1) intentionally or knowingly; (2) threatened Chris Mahurin with imminent bodily injury; (3) knowing he was a public servant while lawfully discharging an official duty. TEX.PENAL CODE ANN. §§ 22.01, 22.02. The evidence is legally sufficient to support Appellant's conviction. Appellant's sole issue is overruled.

We note that the trial court's judgment included in the clerk's record contains a clerical error. The judgment is titled, "Judgment of Conviction by Jury" and, on its face, indicates that Appellant entered a plea of not guilty to the offense of aggravated assault against a public servant. The degree of offense recites "1ST DEGREE FELONY." The findings on deadly weapon reflect "YES, A FIREARM." The statute for offense states "22.01(b) Penal Code."

TEX.PENAL CODE ANN. § 22.01(b)(1), assault, provides the following:

(b) An offense under Subsection (a)(1) is a Class A misdemeanor, except that the offense is a felony of the third degree if the offense is committed against:

(1) a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant;

However, TEX.PENAL CODE ANN. § 22.02(b)(2)(B), aggravated assault, is defined as:

(b) An offense under this section is a felony of the second degree, except that the offense is a felony of the first degree if:

. . .

(2) regardless of whether the offense is committed under Subsection (a)(1) or (a)(2), the offense is committed:

9

.            .            .

(B) against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant.

The judgments in Appellant's companion cases 08-20-00011-CR, 08-20-00012-CR, and 08-20-00013-CR all reflect the level of offense as "22.02(b)(2)(B)." The record before us makes it clear Appellant was convicted of aggravated assault of a public servant pursuant to TEX.PENAL CODE ANN. § 22.02(b)(2)(B).

We have authority to reform the judgment of the court below to make the record speak the truth when we have the information necessary to do so. TEX.R.APP.P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex.Crim.App. 1993). This Court may reform judgments and correct typographical errors. *French v. State,* 830 S.W.2d 607, 609 (Tex.Crim.App. 1992). Further, Appellate courts can reform whatever the trial court could have corrected by a judgment *nunc pro tunc* where the evidence necessary to correct the judgment appears in the record. *Robinson v. State*, 568 S.W.3d 718 724-25 (Tex.App.—Amarillo 2019, no pet.). We reform the judgment by replacing "22.01(b)" with "22.02(b)(2)(B)" to reflect conviction under the correct statute.

## CONCLUSION

Having overruled Appellant's sole issue on appeal, the judgment as reformed, is affirmed.

April 23, 2021

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)

10